|   |   |   |
|---|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT | |
|   | FOR THE WESTERN DISTRICT OF NORTH CAROLINA | |
| 2 | CHARLOTTE DIVISION | |
|   | CASE NO. 3:25-cr-026 | |
| 3 | | |

```
 1                 IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                        CHARLOTTE DIVISION
                       CASE NO. 3:25-cr-026
 3

 4   UNITED STATES OF AMERICA,            Charlotte, North
                                          Carolina
 5                  Plaintiff,
                                          April 3, 2025
 6            vs.
                                          REDACTED
 7   MATTHEW RAYMOND ENCINAS,

 8                  Defendant.

 9   _____

10                 TRANSCRIPT OF DETENTION HEARING
            BEFORE THE HONORABLE SUSAN C. RODRIGUEZ
11             UNITED STATES MAGISTRATE COURT JUDGE

12   APPEARANCES:

13

     FOR THE GOVERNMENT:           DANIEL CERVANTES
14                                 United States Attorney's Office
                                   227 West Trade Street
15                                 Suite 1650
                                   Charlotte, NC 28202
16
     FOR THE DEFENDANT:            ANTHONY G. SCHEER
17                                 Rawls, Scheer, Clary & Mingo,
                                     PLLC
18                                 2333 Randolph Road
                                   Suite 100
19                                 Charlotte, NC 28207

20
     ELECTRONIC SOUND RECORDING STENOGRAPHICALLY PRODUCED AND
21   TRANSCRIBED BY:

22                           REBECCA MAXCY, RMR, CRR
                             Federal Official Court Reporter
23                           United States District Court
                             Charles R. Jonas Federal Building
24                           401 W. Trade Street
                             Charlotte, North Carolina 28202
25                           (704)350-7493
```

1    Thursday, April 3, 2025

2                    P R O C E E D I N G S

3         (Court called to order with the Court, counsel, and

4    Defendant present.)

5         THE COURT:  All right.  We're here in the matter of

6    United States vs. Encinas or Encinas.

7         Mr. Scheer, how do I pronounce that?

8         MR. SCHEER:  I'm sorry, Your Honor?

9         THE COURT:  Is it Encinas or Encinas?

10        MR. SCHEER:  It is Encinas.

11        THE COURT:  Encinas.  All right.  We're here for his --

12   it's set as a bond hearing, although I believe, Mr. Scheer,

13   correct me if I'm wrong, he originally consented to detention

14   and reserved his right to have a detention hearing; is that

15   correct?

16        MR. SCHEER:  That's correct, Your Honor.

17        THE COURT:  All right.  Very good.  All right.  Well,

18   it is your motion, so I'll go ahead and hear from you first

19   and then we'll hear from the government.

20        MR. SCHEER:  Thank you, Your Honor.  In that -- this is

21   one of those situations where were we not to have waived we

22   would have heard the government --

23        THE COURT:  The government first, right.

24        MR. SCHEER:  I'm happy to proceed.  And, obviously,

25   I'll want to address --

1          THE COURT:  I'll give you a chance to respond.

2          MR. SCHEER:  Thank you very much.  Oh, thank you.  Go

3    to the podium.  I always forget that.  Thank you, Your Honor.

4          So I understand that we're here, obviously, on a

5    presumption case.  Presumption of detention exists in this

6    case, and I think that we have plenary, lots of reasons to

7    overcome that presumption of detention in Mr. Encinas's case.

8    And I'll focus on those and address some specific issues as I

9    go along.

10         So the greatest concern, I think, here is actually

11   having to do with the risk of safety to the community and

12   others, which I think is easily managed by conditions that are

13   available to the Court.

14         As far as flight risk is concerned, Your Honor, he's

15   never had a passport.  He's never left the country.  He has

16   tremendous ties to the community.  And I'll introduce you to

17   the people over here to your left in the back of the courtroom

18   in a few moments.  Ties to the community -- as the Court has

19   seen, I hope, having filed the letters in support -- has the

20   Court had an opportunity to review them?

21         THE COURT:  Yes.  I have them here.

22         MR. SCHEER:  Thank you.  And as the Court can see,

23   notwithstanding the allegations that have been lodged against

24   him by the government, he's been -- he's kind of an exemplary

25   family man and friend to an awful lot of people.  And his life

1     is deeply wrapped up in so many ways with the folks that are

2     here in the courtroom and many, many others that are not here

3     today.  So in terms of being released safely, there's an awful

4     lot going on here.

5          I think that first I want to point out that the

6     searches done in this case were in late March of last year, and

7     the investigation continued, as they do.  But as the Court

8     knows, the government is at liberty, if you will, to swear out

9     a criminal complaint and have somebody taken into custody and

10    bring this issue before the Court with urgency if they feel

11    that there's urgency required in doing so.  He was out of

12    custody for ten months before the indictment in this case and

13    his arrest, and I think that that speaks to the degree to which

14    there was concern that he'd be reoffending, if the allegations

15    even were proven to be true.

16         He has no significant criminal history whatsoever.  And

17    finding himself, as he does now, in first the Gaston County

18    jail and then in Pikeville, Kentucky, and here most recently a

19    resident up in Newton, he's experiencing something that he's

20    never experienced before, and that has a sobering effect on one

21    in terms of the way they conduct themselves when they are

22    released, Your Honor.

23         So much of what has to -- what, I think, bears on the

24    question of whether he can be released safety and whether the

25    presumption can be overcome has to do with the conditions that

1   are available to you, Your Honor.  First of all, I'll tell you

2   that his in-laws, that is his wife's mom and dad, Rhonda and

3   Matt Johnson, who are in the courtroom back here -- raise your

4   hands -- from very day one they offered their house and their

5   efforts to support him in any way, and that includes in this

6   case 3142(c)(B)(i) designation as him being in their custody

7   with a legal duty to report any kind of departures, if you

8   will, from the Court's ordered conditions of release.  They are

9   around almost all the time, for starters, but the Court has

10  seen letters from both of them and can get a grasp of who they

11  are.  So the Court has that.  He'll be living there.

12          Obviously he will not be able to have any contact of

13  any kind with his xxxxxxxxxxxx, who is an alleged victim in

14  this case.  She is in the courtroom today, Your Honor.  I'll

15  address that in a moment.  But I'm not going to name her, even

16  though she's not a minor.

17          In any event, so there's a very stable place for him to

18  live with people who ought to be skeptical of the man by virtue

19  of the fact that they are the grandparents of the primary

20  alleged victim in the case.  And if they didn't believe in him,

21  didn't trust that what they knew of him would enable them to

22  serve in that legal position as having custody of him at your

23  order, I don't think that -- I just think that's an extremely

24  strong position to be in.

25          Obviously the Court has at its disposal a very

1   restrictive curfew or, for that matter, 24-hour house arrest.

2   And that curfew and that arrest can be monitored with United

3   States Probation and Pretrial Services' office through GPS

4   monitoring.  And I would think that GPS monitoring is -- along

5   with the Johnsons' supervision, we'll know exactly where he is

6   at all times.

7          The Court has probably seen in some of the letters that

8   were submitted that he's a day trader in cryptocurrency, has

9   been doing that full time now for about two or three years; was

10  part time doing it for quite a while.  So computer access is

11  how he does his work.  I'm going to talk in a minute about the

12  gravity of his not being able to maintain and work on the

13  trading platforms that he's been doing full time, but as to the

14  conditions that will also assure safety is that probation can

15  also install monitoring software on the one device perhaps that

16  he would need in order to do his job, but they could do it on

17  multiple devices.  That's available to the Court.  And given

18  his job and given the nature of the allegations against him, I

19  think that that would be appropriate.

20         So with full knowledge of where he's at from monitoring

21  and the people out there to make sure that he's doing right by

22  those things and probation's ability to monitor his activities

23  even while in that house, I do think that the presumption in

24  the case is overridden and that there are conditions that the

25  Court can set that would allow him to be released.

1          I note also, then, circling back on this finally, that

2     we are here with pretrial services recommending his release.

3     And I think that deference should be given to pretrial on that

4     basis since they're the ones who have --

5          THE COURT:  Just so that it's clear for the record,

6     pretrial services does not take into account the presumption of

7     detention.  So when they do that, they do not take that into

8     account in terms of the statute.

9          And if Sarah wants to just confirm that for me, that is

10    my --

11         UNKNOWN SPEAKER:  That's correct, Your Honor.

12         THE COURT:  Okay.  I was just noting that for the

13    record.

14         MR. SCHEER:  Yes, Your Honor.

15         THE COURT:  Your point is taken, but I want to note

16    that for the record.

17         MR. SCHEER:  Thank you.  Thank you.  I would say,

18    though, that in -- though the presumption, pretrial isn't, if

19    you will, doing the legal balancing, which has the added

20    presumption added to it, they are saying that they believe they

21    can supervise him.  And I think that in the ways that I just

22    described they can.

23         And fundamentally I'd like to bring this question back

24    to the basic question, which is do we think that he's going to

25    continue to offend.  If the allegations were true, do we think

1     that he's going to continue to offend under those conditions.

2     That's what it takes to overcome the presumption.  And I think

3     that those issues that we've discussed very much do.

4         I think when the statute also directs the Court to

5     consider the strength of the evidence against him -- and I know

6     that the government will talk about it.  I'll speak after they

7     do to the issues that we see with the evidence against him.  I

8     think that on this question of the presumption we should also

9     look at what the -- when we talk about least restrictive

10     circumstances -- and we're not suggesting any lesser

11     restrictive.  We're talking about maximum restrictive

12     conditions.  But when we talk about that, one of the reasons

13     for that is the presumption of innocence that a person has, but

14     another reason for that is the recognition that the detention

15     often and usually does have collateral consequences that are

16     quite damaging.

17         Here we have much more of that than we usually see.

18     Obviously anybody who is detained, that is for most people a

19     financial problem.  Here because of Mr. Encinas's job and

20     those that he also -- primarily in his family but also, as I

21     think you've seen, Hunter Obrikat, who is his partner in an

22     investment club, there are substantial assets out there.

23     Mr. Encinas's absolutely the expert.  He's the trader.  He's

24     the person who has been managing these people's assets.

25         So as I told you, he's been doing that for quite a

1   while.  The investment club that he is in with Mr. Obrikat has

2   several hundred thousand dollars at the time of his arrest on a

3   platform called MEXC.  Without regular log-in that platform,

4   many crypto platforms shut down the account.  It's been locked.

5   And it's unlocked through know your customer, KYC,

6   authentications involving facial recognition and so forth.

7   That account can't be unlocked with him in custody.  It just

8   cannot be unlocked.

9           THE COURT:  Does the Court need to appoint a receiver?

10          MR. SCHEER:  Your Honor, so these are mostly overseas

11   platforms.  I'm not going to claim to be an expert at it, but

12   this is nothing like --

13          THE COURT:  You don't need to go too much further in

14   that.  I understand what you're saying here.

15          MR. SCHEER:  Okay.  It's not like a bank account.  It's

16   nothing like bank --

17          THE COURT:  I'm familiar with cryptocurrency.

18          MR. SCHEER:  Well, great.

19          THE COURT:  All right.  Point taken on that.  Just I

20   think that is something to keep in mind if there are other

21   people's money there.

22          MR. SCHEER:  Thank you.  So in addition to

23   Mr. Obrikat's money, he's also been trading for his

24   father-in-law and his uncle and a couple of other family

25   members on another platform, which is also locked.  And that's

1    substantially more.  I think that I included -- I did in fact

2    include an email from Mr. Johnson, his father-in-law, who has

3    stated that a great deal of his retirement income is in that

4    platform and is locked.

5           I'll also note that starting this month 1 percent fees

6    are going to be charged by all these platforms on locked

7    accounts.  So that in the case of the investment club he's in

8    with Mr. Obrikat, $3,000 a month is what they're going to

9    charge.  And that's if the crypto is at 300,000.  Nobody knows

10   what the value of that crypto is right now, but having -- but

11   it's quite possible, as volatile -- the Court knows about

12   crypto, apparently.  The Court knows that that account could be

13   a half a million dollars.  It could be $200,000.  It could be

14   even more right now because of how crypto has been going.

15          But a 1 percent fee is going to start to be charged on

16   these accounts.  And as it pertains to his father-in-law and

17   uncle that are primary investors in crypto through his trading

18   for them -- essentially another investment club with them --

19   that's considerably more money.

20          And then there's, finally, something that I didn't want

21   to file, Your Honor.  I did bring paper exhibits.  I considered

22   filing it under seal but didn't think that that was quite

23   right.  I would like -- I'll proffer and I'll show the Court,

24   if you'd like, the two documents that I've got and give them to

25   the government as well.

1          Prior to 2023 with Mr. Obrikat, their investment club

2     was -- had been very successful.  He's a very good trader, and

3     they had assets at about $2 million.  When the platform that

4     they had invested on shut down their account, citing what they

5     say were bogus reasons, they've sued in the court but

6     designation in the Seychelles.  Last year they filed a

7     complaint.  The court saw fit in the Seychelles -- and I have

8     the order -- to enter essentially what I believe is a TRO under

9     American law ordering the seizure of the $2 million that they

10    claimed at the time was the value of the crypto accounts that

11    Fortunate Icon, MetGlobal, and Peken Global Limited had frozen

12    on them.

13         So the court, I think, seized the funds.  And now they

14    have trial, a bench trial, albeit, but they have a trial date

15    of June 9th.  And I have in the documents that I've got -- I've

16    got a copy of -- I may have given you every one of my copy of

17    the email.  Did I?  I did -- an email from their lawyers in the

18    Seychelles saying that they have trial next month.

19         They were supposed to have a trial preparation session

20    a couple of weeks ago.  Mr. Obrikat, who has been in touch with

21    them, obviously -- and, by the way, is unfortunately not

22    directly the trader on those accounts.  He doesn't have control

23    of them.  Mr. Obrikat has been in touch with their counsel and

24    has delayed the trial preparation session to next week.  And he

25    can delay it some more, but we believe that that litigation,

1    over $2 million worth of assets, really can't go forward

2    without his active participation in it.  And presumably, of

3    course --

4              THE COURT:  He's not going to be able to travel to the

5    Seychelles.

6              MR. SCHEER:  I don't think that he needs to do that,

7    Your Honor.  And I haven't been able to reach the lawyers in

8    the Seychelles, who are about 12 or 14 hours off of us.

9              THE COURT:  And supposed to have beautiful beaches.

10             MR. SCHEER:  Yes, gorgeous.  And I understand one delay

11   they actually had in this case was a typhoon that struck the

12   island when they were having a previous hearing.

13             But it's another real complicating factor there.  I

14   don't want to dwell on it anymore, except to say -- and I'll

15   offer this up if the Court would like to see the actual

16   documents.

17             THE COURT:  I'm happy to take whatever you'd like

18   to provide to the Court.  It's completely your call what you'd

19   like for me to see.  And then I probably need to ask

20   Mr. Cervantes if he has any objection to that.

21             MR. CERVANTES:  To the introduction of these documents

22   as exhibits?

23             THE COURT:  Uh-huh.

24             MR. CERVANTES:  No objection.

25             THE COURT:  Okay.

1        MR. SCHEER:  May I approach, Your Honor?

2        THE COURT:  You may come.  Thank you.

3        All right.  Mr. Scheer, since you've introduced them as

4   exhibits, the Court will just instruct you to keep these on

5   your files as exhibits.

6        MR. SCHEER:  Thank you, Your Honor.

7        THE COURT:  And if there's ever an appeal issue, then

8   you will produce them at that time, since you said you did not

9   want them necessarily --

10       MR. SCHEER:  I could file them under seal if the Court

11  would prefer me to do that.

12       THE COURT:  Well, the only thing is is like -- I would

13  have to do my research on whether Seychelles has a closed

14  docket, but I'd be surprised if they do.  It looks like a court

15  order to me, so my guess is it's probably public.

16       MR. SCHEER:  It probably is, Your Honor --

17       THE COURT:  Now, the letter to the attorney is between

18  attorneys.  I would be probably more inclined to put that under

19  seal.

20       MR. SCHEER:  Okay.  All right.  Thank you, Your Honor,

21  for that guidance.

22       So -- and then there's -- the last thing that I would

23  like to say, and it's not the crux, but again, with this idea

24  of least restrictive in mind, I think the statute contemplates

25  the Court taking a deep and searing look at whether or not

1    there are conditions on which he can be released safely, which

2    we would contend there are. It's nobody's fault that we don't

3    have a place to house federal inmates with any real proximity

4    to Charlotte. We have a few that are in Gastonia, a few in

5    Catawba County, and a few much farther up in the mountains.

6    But the bulk of them are at Dayton (sic), Georgia, or

7    Pikeville, Kentucky, which is where the marshals have got him

8    housed for the time being.

9        And I'll just say as I do in every detention hearing,

10    Your Honor, that having a client in a pretrial mode where there

11    is substantial and complex discovery being housed six hours

12    away is a substantial impediment on the defense. And I only

13    bring that to your attention or I should say remind you of it

14    at this point to underscore the need for that searing question

15    of whether or not he is liable to reoffend if he's let out on

16    the conditions that we've described today. That will be my

17    showing at this point.

18        THE COURT: Okay. I'll give you an opportunity to

19    respond.

20        MR. SCHEER: Thank you, Your Honor.

21        THE COURT: Mr. Cervantes.

22        MR. CERVANTES: Thank you, Your Honor. One of the

23    factors, as the Court knows, that the Court takes into account

24    in determining whether someone should be released on bond is

25    the strength of the evidence, and so that is where I will

1    start.  This is a case involving surreptitious recordings of

2    minors.  There are several videos.  In particular with regard

3    to minor victim 1, who is the xxxxxxxxxxxx, and minor victim 2,

4    who is the friend of the xxxxxxxxxxxx, I'm going to describe

5    the videos --

6          THE COURT:  Let me just pause one second.  I want to

7    instruct our interns.  If there's anybody who wants to step out

8    at this time or even the courtroom, this may get a little bit

9    deeper.  Mr. Cervantes, do I have that right?  And so if

10   there's anybody who wants to step out, you may do so now.

11         Otherwise, go ahead, Mr. Cervantes.

12         MR. CERVANTES:  Yes, Your Honor.  That's correct.  I

13   will be describing what we believe is properly characterized as

14   child pornography, including of an infant.

15         THE COURT:  Okay.  You may proceed.

16         MR. CERVANTES:  Thank you.  So with regard to the

17   xxxxxxxxxxxx, there's several videos where the defendant

18   captured her naked in the bathroom.  The substance of it is

19   that she is -- appears to have finished bathing.  She is

20   wrapped in a towel.  She takes a towel off.  She's positioned

21   in a way that she is in front of the camera and bends over and

22   exposes inadvertently her pubic and vagina area to the camera.

23         The positioning of the camera is down on the ground

24   pointed up towards anybody's pubic area that would have passed

25   by in front of this camera.  And you can see that there's sort

1  of like a mesh screen as if it's a laundry hamper or something

2  like that that the camera is behind.  But you can still see who

3  it is.  And, sure enough, the xxxxxxxxxxxx has identified

4  herself in that video, which I'll get to.

5       So there's a couple --

6       THE COURT:  Do you have any intel -- what was the size

7  of that camera?  Was it, you know, a video camera, like a large

8  one, or was it one of the small, kind of spy cameras?  Do we

9  have any idea?

10       MR. CERVANTES:  We don't know, Your Honor, because we

11  weren't able to recover that, but we believe that it was a Ring

12  camera.  Some of the videos have a watermark that say Ring on

13  it.  And, sure enough, the wife, the xxxxxxxxxxxx, the friend,

14  they all confirmed that there were Ring cameras in the home.

15  Everybody knew that there was a Ring camera at the front door.

16  Everybody knew that there was a Ring camera in the living room.

17  Everyone denied that there was any knowledge of any Ring camera

18  in any of the bathrooms or any of the rooms.  And everybody

19  said that the only person in the house who had control over the

20  Ring camera devices and application was Mr. Encinas.

21       All right.  And so that's the xxxxxxxxxxxx in terms of

22  the video and what it depicts.  The friend was -- the defendant

23  captured her in one of the rooms.  Sometimes the friend would

24  stay over.  That's not in dispute; she would stay over.  And

25  the camera, again, is on the floor pointed up.  She comes into

1    view of the camera in one of the videos and takes her pants off

2    and bends over inadvertently, again showing her vagina and

3    pubic area to the camera.  That's in one video.  Another video,

4    it seems like it's a separate night, but the same thing,

5    capturing her naked.

6           All right.  These videos were sent to an undercover by

7    the defendant on an app called Session.  Session is a chat

8    application app, and it provides for user anonymity.  So there

9    isn't much to track on the Session platform.

10          The defendant also sent these pictures and videos of

11   the two minor victims and others, which I will get into, on

12   Telegram.  We found that on his phone.  What he sent on

13   Telegram was not the part where these minors are clothed.  He

14   sent clips, screenshots of the parts where he captured their

15   vaginas on camera.  That's what's in Telegram.  That was in the

16   phone that was in his pocket at the time that law enforcement

17   went to execute the search warrant.

18          There are multiple versions of these videos and clips

19   also on his phone, his desktop, and his laptop.  His phone also

20   had images and videos of child pornography, some of which

21   depicted a victim as young as an infant, as I mentioned a

22   moment ago.  As a result, he's charged with two counts of

23   production of child pornography.  Each count -- one count is

24   for the xxxxxxxxxxx; the other count is for the xxxxxxxxxxx's

25   friend.  One count of distribution of child pornography,

1   because he sent these videos to the undercover on the Session

2   platform.  And then one count of possession of child

3   pornography involving prepubescent minors.

4        Congress has mandated that when charged with production

5   and distribution the starting point is to presume that the

6   defendant is a danger and a risk of flight.  All of these

7   charges qualify as crimes of violence as that term is used in

8   18 U.S.C. 3142(g).

9        So, Your Honor, first I'm going to go into more detail

10  on Session, how we found him, how we know he was the guy

11  sending this stuff.  Then I'm going to get into a search of his

12  apartment where we collected his devices and why we know these

13  are his.  Then I'm going to get into the forensics on the

14  devices.  Forensics means just an analysis of the devices.

15  Interviews that are relevant to this analysis.  And then I'll

16  briefly touch on penalties that he's facing, the letters of

17  support, and pretrial services' report.  And, also, I'll take

18  that opportunity to respond to some of the arguments that

19  Mr. Scheer has already made.

20       So, first, let's talk about Session.  In November of

21  2023 the FBI learned about the defendant because he took these

22  surreptitious recordings of his xxxxxxxxxxxx and her friend and

23  he sent them to undercover on the platform.  He used two

24  accounts on that platform; one by the user name Y and one by

25  the user name X.  So on November 26, 2023, the undercover saw

1   user Y in a chat group dedicated to sexual taboos within the

2   Session application.  User Y said that he was a perv father.

3   So the undercover sent a direct message to user Y on the

4   Session platform and a chat conversation started.

5          Y said that he had two stepchildren, ages 17 and 19, as

6   well as younger boys.  When asked if user Y had ever done

7   anything sexual with either of his stepchildren, user Y said

8   some touching, rubbing and grinding, laid in bed with her and

9   stroked it, came in my boxers and pressed the cum in my still

10  hard cock against her bare ass as I spooned her back to sleep.

11         User Y further advised he did, quote, a lot of creeping

12  and had, quote, tons of pics and, quote, some vids and, quote,

13  girls only, suggesting that the pictures and videos were of his

14  xxxxxxxxxxxx.

15         User Y told the undercover that he had hidden cameras

16  set up in his house.  User Y sent the undercover screenshots of

17  videos that captured his xxxxxxxxxxxx and one of her friends

18  nude, as well as other girlfriends of the xxxxxxxxxxxx.  These

19  weren't the only two people he captured, and I'm going to get

20  into that.

21         User Y said that, quote, all of the pics are SD or her

22  friends.  We believe SD stands for xxxxxxxxxxxx, of course.

23         So then a couple days later the undercover saw user X

24  on the platform, December 1, 2023.  And I'll note that is the

25  date of distribution, so that's an important date in the

1    indictment.

2         So the undercover saw user X in a chatroom dedicated to

3    sexual taboos.  And user X stated that he was from Miami, was

4    37 years old, had four kids, and shared his two stepdaughters,

5    ages 17 and 19.  User X said he enjoyed taboo fantasies and

6    that, quote, SDs and their friends were on his mind.  So SD,

7    his xxxxxxxxxxxx, and her friends were on his mind.  User X had

8    not, quote, gone all the way with his xxxxxxxxxxxxx but noted

9    that one of his xxxxxxxxxxxxx liked to cuddle and that he,

10   quote, groped, grinded, and touched one of them.  He further

11   explained that he ejaculated with her lying next to him.  User

12   X further said that he had, quote, tons of creep shots and

13   pics, some of which were nude.

14        So continuing on December 1st, user X sent the

15   undercover these videos.  He sent the undercover a 30-second

16   video of the xxxxxxxxxxxx, one of the ones that I described at

17   the beginning of this presentation.  The xxxxxxxxxxxx

18   identified herself in the video.  Her mom identified herself in

19   the video.  The friend who knows the xxxxxxxxxxxx, of course,

20   also identified her.  There's no question of who is depicted in

21   this video -- or these videos, because there were multiple.

22        User X also sent on December 1, 2023, the undercover a

23   similar video of the xxxxxxxxxxxx's friend where -- which is

24   what I described earlier; and, again, camera on the floor

25   facing up.  The FBI identified and interviewed her.  She

1    identified herself in the video.  And, again, there's no

2    question of who is depicted.

3          At the time that these videos were sent both girls

4    would have been 17 years old.

5          User Y and X are the same.  And I'm going to get into

6    how we know that it's the defendant.  User X -- so, first, Y

7    and X are the same.  Here is why we know that.  User X shared

8    49 images and ten videos with the undercover.  At least two of

9    these images are the same as pictures Y sent to the undercover.

10   We know that the defendant was both user X and Y, as I'll

11   discuss a little bit more in more detail when I get into the

12   forensics.

13         The FBI discovered many of these images and videos in

14   the defendant's devices; phone, laptop, and hard drive, across

15   three devices, Your Honor.

16         THE COURT:  So he had a separate hard drive as well?

17         MR. CERVANTES:  Yes.

18         THE COURT:  Okay.

19         MR. CERVANTES:  We --

20         THE COURT:  Like a stand-alone one that he had

21   purchased?

22         MR. CERVANTES:  Yes.  And so, basically, there's a room

23   that had two monitors for his trading and a desktop that was

24   connected that would run the two monitors.  So that hard drive

25   is one of the devices.  Then on the chair to that desk there

1 was a backpack with a laptop in it. That's another device.

2 And then the phone that was on it, that's the third device.

3   THE COURT: Okay.

4   MR. CERVANTES: We found evidence of Session being run

5 on his phone, hard drive. And I'll get into that when we get

6 into the forensics in a moment. User X also sent pictures and

7 videos of himself. And as the Court knows, this is common in

8 these cases where the user sends pictures and videos of

9 himself, and the defendant did the same.

10   Some of the videos that user X shared were nudes of

11 himself and him and his wife engaging in sex acts. There's a

12 standing side profile of an adult man with his pants partially

13 pulled down, exposing his erect penis. The man's arm sleeve

14 tattoo is visible. And the picture kind of cuts off at the

15 bottom of his face, so that's why I'm not saying that his face

16 was depicted. But his wife identified him in the picture as

17 the defendant. And we found that picture on his phone, so we

18 know it's him.

19   He also sent another picture of him laying on the couch

20 with only boxers showing his abdomen and sort of taking a

21 selfie of his own body. Again, the picture kind of cuts off at

22 the mandible of his face. His wife identified him in that

23 picture as well. But even if the wife hadn't identified him,

24 we know it's him, Your Honor. We got a body warrant for him

25 when he was arrested. FBI took pictures of his tattoo and his

abdomen.  The tattoo is a match.  It's an intricate tattoo involving corals and beach stuff.  There's a manatee.  The defendant is from south Florida.  It's very south Florida-ish of a tattoo, myself being from Miami.

THE COURT:  You're from there as well.

MR. CERVANTES:  I know the tattoos.  The body is also a match.  There are birth marks that just match, around the abdomen, above the left nipple.  I'm not going to get into it, but they match.

And so the undercover asked as well user X if he had another form of communication to keep in touch, given that Session isn't so traceable.  And user X said that his Snapchat name was rayday69.  And this is where we then were able to track him all the way down to his apartment, because, in fact, when subpoenaed that account shows that the subscriber information has an IP address, right, and so that IP address shows where in the world the person created the account.  It's your online address.

And I know that the Court understands what that is, but -- and so, sure enough, that IP address used to create the account was assigned to the defendant's apartment.  That's where the rayday69 account for Snapchat was created, and that's where we went next.

So let's talk about the search warrant.  March 29, 2024, FBI go to the house.  The defendant opened the door.  He

1    had a phone on him that was seized.  The FBI seized 13

2    electronics.  I'd already mentioned the relevant electronics,

3    the iPhone and then the desktop and the Lenovo laptop.

4         The attribution -- and I'll just speak to this for a

5    moment.  There's attribution evidence showing that he's the one

6    that operated the computer desk area, right.  For example,

7    there's a wedding photo of him and his wife.  There's a credit

8    card in his name.  There was a backpack on the chair.  Inside

9    the backpack was the Lenovo laptop, but there was also a notice

10   of noncompliance addressed to the defendant regarding child

11   support enforcement.  There's also a white powder which field-

12   tested positive for cocaine.  And there's a picture in his

13   phone showing the computer set up and stocks being traded on

14   the double monitor.  I mean, other than him sitting there, I

15   don't know what better evidence there would be to show that

16   he's the user in that area.

17        And I'll also get into in a moment the users associated

18   with the hard drive are all his names.  So let's talk about the

19   desktop hard drive and the attributions associated with it.

20   There are only four users, right.  So this is when you boot up

21   the computer it asks you who is the user.  There are only four

22   users.  They're all versions of his name.  One user is matthew.

23   Another user is mrenc.  Another one is mrenc and then a series

24   of numbers and letters.  And the fourth is matth.  All versions

25   of his name.  And all of the -- and I'll talk about this in a

1    moment.  The surreptitious recordings that we found in the hard

2    drive were found in the matthew user account.

3          So one of the things we look for, of course, is

4    evidence that Session was accessed on the hard drive.  And, in

5    fact, we confirmed it.  Session was bookmarked.  A bookmark is

6    something you do when you go to a website frequently.  Its

7    worth merits being bookmarked so that you can get there faster.

8    You bookmark it.  That's what was shown in this hard drive.

9          We also found approximately ten images and six videos

10   that matched those sent by user X and Y.  How did it get there

11   if it wasn't the defendant that sent it to the undercover on

12   the Session application?

13         There are other videos that don't match but that are

14   visually similar to these bathroom and surreptitious

15   recordings.  In other words, there are other recordings in the

16   same bathroom and rooms that looked like the same bathroom and

17   rooms that are depicted in the content that the defendant sent

18   to the undercover.  These aren't necessarily ones that depict

19   child pornography, but it just shows that it's more of the

20   content of surreptitious recordings that he made that he stored

21   on his desktop hard drive.

22         So let's talk about the xxxxxxxxxxxx's friend, minor

23   victim 2.  There's several videos of her undressing in front of

24   the camera and, again, the defendant captured her pubic area

25   and her vagina.  The camera in all of these videos is pointed

1    from the floor up.

2         The date on one of the screens is October 2022.

3    Sometimes these home recording devices will have a screen, sort

4    of like a water stamp that provides a date and time.  The date

5    and time -- the earliest date and time that we could find

6    associated with these recordings is October 2022, which -- and

7    I say that so that the Court understands the extent of time

8    that this conduct was occurring.  And that is, in fact, the

9    basis for -- the charges for the production is a date range,

10   and that date range is from October 2022, for that reason, all

11   the way through the date that it was sent to the undercover on

12   Session.

13        So with regard to the xxxxxxxxxxxx, there are other

14   recordings in the bathroom, one of them where she comes in and

15   she sits on the toilet.  Her pubic area is not visible in that

16   one because the angle of that camera seems to be like a wall

17   camera.  There are these -- we didn't recover one, but it could

18   be like a spy camera that's installed in a socket.  And it

19   seems like this camera angle was coming from an electrical

20   socket on top of the counter, pointing across the counter, and

21   at the end of the counter was the toilet.  And so what you see

22   is the xxxxxxxxxxxx coming in to sit down on the toilet, but

23   you don't see her actual pubic area.  It could be another

24   attempted production, but it's not charged in that one.

25        There are other girlfriends.  So there's a video

recording in the bathroom -- so the master bathroom, the same

bathroom where the xxxxxxxxxxxx was recorded, has the closet

that's accessible to the bathroom.  It's connected.  So if you

go to the bathroom, you can also go into the master bedroom

closet.  And inside of the closet on like a top shelf the

camera was positioned, and so it comes at like a far angle.

You can see still part of the closet and then the closet doors

open, and you see the bathroom.

In the bathroom were the xxxxxxxxxxxx, the minor victim

2, and some other girlfriends hanging out in the bathroom.  One

of them uses the toilet.  And they're sort of talking.  This is

one of the recordings that he had in the hard drive that we

found.

Next let's talk about the iPhone.  The first thing we

did, look for Session.  Was there, yes.  Chrome had a history,

web history of visiting Session.

And, Your Honor, I'll just note Session is not a common

chat application.  Like if we were talking about, you know,

maybe even just Snapchat, that would be something less

significant.  But Session is more obscure, and the fact that

it's on there I think makes it even more relevant, right, in

addition to everything else.

Next on the phone, significant piece of evidence is

Telegram.  So in Telegram there were 92 images and 148 videos

that were recovered.  Some chats are recoverable and show the

1 defendant talking about crypto schemes. Some of the other

2 chats are not recoverable. What's widely recoverable are the

3 pictures and videos traded through Telegram because the app

4 automatically saves whatever images you send or receive into

5 the app, into the application. And so those are recoverable

6 because they're coming from the device as opposed to connecting

7 the device to the Internet and then the device pulls more

8 information from the server, which would provide more

9 information. But right now the device is not connected,

10 obviously, to the Internet, so this is what we can gather from

11 the device in its current state.

12 Those pictures show the defendant, his wife, their son,

13 the defendant with other adult males, the defendant -- innocent

14 pictures and videos, right. The defendant's driver's license.

15 And then there's the child pornography, which, you know, I'll

16 take a moment, Your Honor, to just note. I realize that a lot

17 of this is a surprise to the family and friends, and the child

18 pornography is also going to be a surprise to the family and

19 friends, but it's there, and so that's why I'm talking about

20 it.

21 First, let's talk about the content in Telegram related

22 to the xxxxxxxxxxxx and the xxxxxxxxxxxx's friend. There are

23 19 images of the xxxxxxxxxxxx in Telegram. Some were shared.

24 They look like the ones shared with the undercover. Some were

25 not. And, remember, Telegram is a chat platform. Its sole

1    purpose is designed for chatting with other people.  And so if

2    this content is there, it's because it's being sent to someone

3    else.

4         There are 28 images of the xxxxxxxxxxxx's friend in

5    Telegram.  Some look visually similar to the ones that the

6    undercover received from the defendant; some don't.

7         What's important about these images of the xxxxxxxxxxxx

8    and her friend is that they are screenshots of the most

9    critical moment in these videos that capture their private

10   parts, Your Honor.  And that shows the focus and the intent and

11   the purpose for which the defendant chose to record these

12   minors when they were naked.

13        There are -- and this will also be new information for

14   the defendant's wife, and I apologize, but this is the

15   evidence.  And I don't mean to say this in this hearing to

16   disparage her in any way.  There are eight images and 45 videos

17   on Telegram of his wife performing sex acts, some of which were

18   shared with the undercover.  This shows that the defendant was

19   sharing these videos with others, not just the undercover.  And

20   the fact that he's willing to do this to his wife is further

21   evidence of his deceitfulness to the people close to him in

22   this community, many who are here today.

23        In an interview with the FBI, the wife said that she

24   was aware of the sex videos, so this is not a surreptitious

25   recording.  And based on the camera angle, it's -- he's holding

1   it, so it appears like it's obvious that she would have

2   knowledge.  And she said in fact that she did have knowledge,

3   but she thought those were just on his phone and did not

4   believe that he had shared those with anyone.

5        There are other videos and images of the bathroom and

6   bedroom recordings that don't necessarily depict child

7   pornography, and I won't get into all of those.

8        So let's talk about some of the child pornography.

9   I'll start with a 41-minute compilation video of a girl who is

10  approximately ten years old engaging in various sex acts with

11  an unknown adult male.  Ten years old.  So this is -- we're not

12  talking about someone who could possibly be 16 or -- ten years

13  old.  At the beginning of the video the girl stands alone in a

14  room and is fully clothed.  The girl is recorded taking off her

15  clothes until she's fully nude.  During the video an unknown

16  adult male enters, engages in oral and anal sex with this

17  ten-year-old girl.  The male ejaculates on the girl's face,

18  chest and stomach.  At approximately the 31-minute mark the

19  girl is lying on a bed after the male ejaculated on her face

20  and an unknown person appears to take photographs of this girl.

21       There's an infant, we would estimate approximately two

22  months old, being forced to perform oral sex on an erect male

23  penis.  There's a two-year-old boy on his back.  There's an

24  adult male holding the boy's legs back while the adult rubs his

25  erect penis on the boy's genital, and he's being held down by

 1    his feet.

 2            This is important, Your Honor, because there's two

 3    young boys in the home with Ms. Encinas.

 4            THE COURT:  I saw.

 5            MR. CERVANTES:  And as I will discuss in a moment, he

 6    was a part of several chat groups that involve boys and

 7    homosexual conduct, which I'm sure is going to be another shock

 8    to his family, who has been deceived by the defendant.

 9            The forensics show that he was a part of 189 chats in

10    Telegram.  On Telegram chats can be given a name.  The names of

11    many of these chats are sexual in nature.  Let's go through

12    some of them to see if they're relevant to the charges being

13    filed.  Chat name unicorn daughters, teen girls videos, teen

14    oh, father daughter love, daughter taboo, show your daughter

15    chat, mommy and son, a second mommy and son, mom loves son, mom

16    love son, @teen369, hot teen girls, spy cam.

17            The chat image -- so sometimes you can associate an

18    image with the chat.  This one appears to be an adult woman on

19    a bed with her naked butt in the air and possibly masturbating

20    while there is a clothed minor boy appearing to be sleeping

21    next to the woman.  Pogs and donks in the about section.  The

22    contact for this backup -- the contact for backup is

23    @lordoftheteens.  Another one called mom pedo videos.  Pedo in

24    the trade stands for pedophiles.  Teen live streams two.

25    Gooner trade.  The picture associated with that chat is an

1    adult woman in a bra with a toddler's foot in her mouth.

2    There's one called voyeur sex tapes, the mafia voyeur.

3          Some chats, as I mentioned, with an interest in boys.

4    There's one called gay chat, gay group, hot straight guys go

5    gay, solo gays, which as -- I know the Court speaks Spanish,

6    but for the record, solo means only, so only gays.  Mommy and

7    son chats, as I mentioned.

8          There's another 27 that I have on this list that are

9    sexual in nature, but I've identified the ones that are

10   particularly minor focused or boy focused given the two minor

11   boys in the home.

12         So let's talk about the Lenovo laptop.  Law enforcement

13   found other surreptitious video recordings of minor victim 1,

14   the xxxxxxxxxxxx.  Some are not child pornography.  For

15   example, one depicts her and a girlfriend in a room.  Both

16   girls are talking, but the camera angle is the same.  It looks

17   surreptitious, coming down from the floor up.  There's another

18   recording of minor victim 1 using the toilet in the bathroom.

19         There's an image of a bedroom, minor victim 1's bedroom

20   at her grandmother's house.  This is important, Your Honor,

21   because this is the house that he says he's going to go live in

22   if the Court releases him on bond.  Well, there's evidence that

23   he set up a surreptitious camera there.  There isn't a whole

24   lot of content.  I think this is -- to my knowledge right now,

25   this is the only one of that house that we've been able to

1    find.  But, again, what's he doing with a picture of the

2    xxxxxxxxxxxx's room at the grandmother's house, the inlaws'

3    house?  And we know it's his laptop.

4         Again, this is another shocker for the family, but this

5    is what is coming from his devices.  There is a video that is

6    dated December 2, 2022.  The defendant is in a hotel room with

7    another woman, who is not his wife, where he gets out of the

8    bed.  The woman doesn't seem to pay attention to what he's

9    doing.  He walks over to his laptop.  He fiddles around with

10   the keys, appears to have activated the video camera, goes back

11   into the bed, and then has sex with her.  It looks like a hotel

12   room.  So that's how we know it's his laptop.  How could that

13   be there if it's not him who uses the laptop and controls the

14   content?

15        There are interviews, Your Honor, that FBI conducted in

16   this case.  Minor victim 1 and 2 both identified themselves and

17   each other.  Both said that they knew of cameras that monitored

18   the front door and one that was located in the living room.

19   Both denied knowledge that there were any recordings of the

20   bathroom or the rooms.

21        The wife identified her daughter in a screenshot of one

22   of the bathroom videos, and she also identified the bathroom as

23   her bathroom.  She also said, again, that the only cameras she

24   knew about were the ones in the living room and the front door

25   and that the defendant was the only one who had control over

1    that.

2         So the penalties, Your Honor, I'll move on to that.

3    That, for the most part, ends the factual discussion.  I'm

4    going to go into the penalties now, unless the Court has

5    questions to go circle back on.

6         THE COURT:  No questions at this time.

7         MR. CERVANTES:  So the penalties trigger a basis for

8    risk of flight.  He is looking at a lot of time; life, in fact.

9    The two counts of production trigger -- each trigger 15-year

10   mandatory minimum.  So the Court could theoretically stack it.

11   So on his best day, if he went to trial, he's looking at 15

12   years, but if he goes to trial and he loses all of these

13   counts, the guidelines say that he should spend life in prison.

14   That is what he's facing.

15        I'll address the letters of support, Your Honor.  As

16   the Court knows, I've been doing --

17        THE COURT:  Hold on just a second.  I think you need to

18   be careful about advising defendant of the penalties right now.

19   I mean, usually we do that in initial appearance.  I'm looking

20   at what you have on the sheet, which doesn't exactly line up

21   with what you have just represented.  It could be because of

22   his history, but I don't think he has a criminal history.  So I

23   think we just need to be careful about, you know -- I'll just

24   instruct the defendant.  Talk to Mr. Scheer.  Make sure

25   everybody agrees on the penalties.  But I think we need to -- I

1    get what your point is here, but I think we need to be careful

2    about delving into, you know, penalties.  If your argument is,

3    and I think your argument is, look, he's facing some

4    significant time and so he has the incentive to flee, then make

5    that argument.

6            MR. CERVANTES:  Yes, Your Honor.  And you're absolutely

7    right, that is the argument.  And I recall I was there when we

8    advised the defendant of the penalties he's facing.  And, yes,

9    it's complicated once we start talking about the statutory

10   minimums and maximums and the guidelines associated with that,

11   but the point is, as the Court noted, that he is facing a

12   significant amount of time, which we believe is a reason to

13   flee.  And as we've learned and I'll go into in a moment, he

14   also has the finances, apparently, to do it.

15           So the letters.  The Court knows I've been doing these

16   cases for a long time, cases involving child exploitation.  And

17   these are standard letters for these kind of cases in the sense

18   that, you know, it's always a surprise, it's always a shock to

19   the family and friends.  Because by its nature this stuff is

20   being done surreptitiously, so nobody does know that.  And so

21   people come in, family and friends come in, and they talk about

22   his character without the knowledge of the facts of the case,

23   and it's not their fault.

24           I'll note that many of the letters of support say that

25   they are aware of the charges, but none say that they know the

1  facts.  And that's -- you know, it's normal.  It's common that

2  that happens that way.

3       I'll also note that none of the letters talk about the

4  victims.  In particular -- and we are -- the government is

5  particularly interested in making sure that the victims are not

6  victimized again or the defendant does not have an opportunity

7  to victimize other minors as well.

8       Mr. Johnson said it best in his letter; if the

9  government is right, he's fooled us all.  And that's appearing

10  what has happened here.

11      The only person who submitted a letter and has talked

12  with the FBI is Ms. Encinas, but that was early on in the

13  investigation before we learned everything we learned that

14  ultimately guided our decision to present these facts to the

15  grand jury.  The grand jury is the only one up to today who has

16  actually heard all of these facts.  And they found that there

17  was probable cause to believe that the defendant made the video

18  of his xxxxxxxxxxxx, that he made the video of the friend, that

19  he distributed it, and that he was in possession of child

20  pornography involving prepubescent minors.

21      Ultimately, Your Honor, the defendant was able to

22  submit so many letters of support, the fact that he was able to

23  do that raises our concern for how deceptive he can be and how

24  the people around him have been deceived.  For example, he's

25  shared sex videos with his wife with other people.  That shows

1    the level of betrayal he's willing to do to the closest people

2    to him who are still here, still here supporting him.  If he's

3    willing to betray these people he purportedly loves, what is he

4    going to do with this Court's trust?  How can we believe that

5    he will be honest with probation?  We believe that he simply

6    cannot be trusted out on bond.

7         With regard to the pretrial services report, as the

8    Court noted, which was my main argument on their recommendation

9    for bond, they do not assess the presumption.  And it's just

10   the structure and the way that it goes.  I mean no disrespect

11   by commenting on the report in that way.  There's no assessment

12   of dangerousness.  They're not privy either to the facts.  They

13   only focus on the lack of criminal history and ties to the

14   community, but the ties to the community and these letters,

15   they're not fully informed by the facts.

16        And so I'll also note that it appears that he's also

17   already deceived probation in the form of what finances he has

18   reported.  We take issue with the finances that he has

19   reported, right.  So he says he's a day trader.  He doesn't say

20   crypto.  And I noticed that Mr. Scheer already smartly said in

21   his argument he's a day trader of crypto, but he never -- that

22   wasn't specified.

23        And so let's take a look at what assets he reported.

24   He reported stocks.  The Court knows crypto isn't stocks.

25   They're different.  If you trade stocks, you trade stocks on

the stock market.  If you're doing crypto day trading, you say

it differently.  You don't say I own $40,000 in stocks and what

you really mean is 40,000 in bitcoin or Ethereum, whatever.  So

we are concerned that he is not fully reporting his finances.

        The father-in-law disclosed that the defendant is

managing $200,000 for him.  We learned, in fact, from

Mr. Scheer that it's actually more.  He is a crypto -- quite

the crypto fund manager, which from our perspective really

raises a concern about what finances he has, his ability to

flee.  There's no disclosure at all to probation about the word

crypto, how much crypto he owns.  How is it possible that he's

managing $200,000 in crypto and yet has zero accounts for

himself involving crypto?

        THE COURT:  Mr. Cervantes, I'm less concerned about --

I understand your point on that.  You know, that could just

be -- not everybody is familiar with that.  That could be lost

in translation.  So I get your point on that.

        What the Court is more concerned about -- and I think

Mr. Scheer has already picked up on the Court's concern on

this, but when you're dealing with cryptocurrency -- you know,

a lot of states are just getting into this and the federal

government as well, and it's, of course, changing daily, but

when you're starting to manage money, cryptocurrency for other

people and their retirements, that can create a whole nother

set of issues.  So the Court actually has a concern about that

1    that, Mr. Scheer, I appreciate you raising.  And I think

2    you-all might have to actually examine that a little bit later.

3    Mr. Scheer, you're free on behalf of your client, because if

4    other people do not have access to their funds, that's a real

5    concern.

6            MR. CERVANTES:  And those are also the government's

7    concerns.  And not just that, but it raises -- in the context

8    of this bond hearing, it raises the issue of also his access to

9    funds, right.  So if he's the one who has sole control over

10   this $20,000 for his father-in-law, yes, that may belong to his

11   father-in-law, but if he wants to access those funds to flee

12   somewhere, he has that access, and he could do that to his

13   father-in-law.  That apart from the fact that it also raises

14   concern about his honesty to probation.

15           And so those are the two main issues that we would

16   highlight for the Court with regard to those funds.

17           And I'll also note that on the day of the search

18   warrant Ms. Encinas reported that her income was enough to

19   cover all of the household bills, and as a result, the

20   defendant had not worked for approximately one year.  The

21   defendant spent -- according to her, he spent most of his time

22   at home with the two minor boys and that he previously -- the

23   defendant previously worked in retail.  That seems very

24   different from the picture that we're receiving today about him

25   being a fund manager for $2.7 million.  That's what the

1  complaint -- or that the order says that the fund is related to
2  2.7 million.
3        THE COURT:  Although it sounds like they seized his
4  funds at this point or at least 2 million or so of it.  But,
5  yes, point taken.
6        MR. CERVANTES:  And we've tried to -- his phone has
7  access to a whole bunch of exchanges, as I mentioned.  There's
8  talks on Telegram regarding crypto.  We've subpoenaed two
9  exchanges to try to see if he even has accounts.  That just
10  came back.  We've confirmed that he has accounts in his name
11  with two different exchanges that are overseas.  I have no clue
12  how much money is in there, but there's stuff there to be
13  concerned about, in our opinion.
14        With regard to responding to some of Mr. Scheer's
15  arguments, I'll start with the suggested delay.  So this search
16  happened in March of last year, and he was indicted this year.
17  As the Court knows, it takes some time to go through -- there
18  were 13 devices in this case.  And to prepare this case we
19  meticulously go through each device to try to make sure that we
20  have extracted the most relevant and all information, good and
21  bad, and assess it.
22        There are other reasons for the delay.  We also had to
23  prepare the case as best as possible knowing that the
24  xxxxxxxxxxxx and her mom -- and this isn't a shot at them, but
25  they weren't entirely -- they were reluctant to meet with us

1  and discuss the case.  And so this case is prepared in a way

2  that they won't have to testify if they don't want to.  We've

3  offered to sit down and show them the evidence, and that offer

4  remains standing.

5       THE COURT:  Well, Mr. Cervantes, look, I appreciate you

6  going into it, but let's kind of sort of keep this to, you

7  know, what the standards are here, danger to the community,

8  risk of flight, and anything else you want to tell the Court on

9  that piece.

10       MR. CERVANTES:  I'm just going to conclude, Your Honor,

11  with the top five concerns that the government has.  The

12  defendant victimizes the people he lives with.  He victimizes

13  their friends.  He has access to the minor victim, his

14  xxxxxxxxxxxx, who is 18.  She'll turn 19 soon.  The two young

15  boys.  We're concerned that he's not fully reporting his

16  finances to probation and that if he's able to deceive these

17  eleven people who vouched for the character, that that makes it

18  more dangerous to put him out in the community.

19       Combined with the strength of the evidence, Your Honor,

20  we don't believe that defendant has rebutted the presumption

21  that he's a danger and a risk of flight.  And even if he did,

22  we believe that these circumstances show that there are no

23  conditions of a bond that would ensure the safety of the

24  community or his appearance in court.

25       THE COURT:  Okay.  Very good.  Thank you,

1  Mr. Cervantes.

2           MR. CERVANTES:  Thank you, Your Honor.

3           THE COURT:  Mr. Scheer.

4           MR. SCHEER:  Thank you, Your Honor.  Mr. Cervantes said

5  a while ago that it's only the grand jury that knows what the

6  total evidence was, and perhaps that's true.  I was given

7  discovery by Mr. Cervantes quite promptly a couple of weeks

8  ago.  There's an awful lot of it.  We've reviewed it to a

9  certain extent the best we can in a relatively short period of

10 time, but I do know something about the discovery that came.

11 And based upon Mr. Cervantes's presentation just now, as he

12 talked about the strength of the case and the breadth of the

13 government's alleged evidence, it would appear that perhaps the

14 grand jury did see more than I was given in discovery.

15          And I'm concerned -- I raise this, Your Honor, on the

16 subject of the strength of the government's case and ask the

17 Court to withhold a judgment, perhaps not to lean so much into

18 that presentation, because based upon what I --

19          THE COURT:  Let me just actually put that on the

20 record, Mr. Scheer.  Your point is well taken on that.  And I

21 actually want the defendant to hear this from me.  Look, you

22 are innocent until proven otherwise.  Okay?  That is the

23 standard.  We are not here to try the underlying merits of this

24 case today.  Mr. Cervantes knows that.

25          But the reason Mr. Cervantes put a lot of that

1    information on the record is you do not have a criminal

2    history.  So he -- if you rebut the presumption, it's

3    Mr. Cervantes's burden to show that you're a danger to the

4    community, so that's what he's attempting to do by doing that.

5    So this is not a trial on the underlying merits.

6           And, Mr. Scheer, I will give it the appropriate weight

7    it deserves.

8           MR. SCHEER:  I appreciate that, Your Honor.  But with

9    the Court's permission, I'd like to underscore why that would

10   be based upon what we've learned so far.

11          THE COURT:  All right.

12          MR. SCHEER:  So with respect to the government's

13   feeling that it could fully develop its case and indict ten

14   months later, Mr. Cervantes said that it is a complex case.  It

15   certainly is.  That they had to go through all of their

16   forensics.  I have 302, FBI 302 reports of Agent Atwood's

17   review of the forensics.  I believe that every one of them was

18   done between April and June of last year that that review was

19   done.

20          Except I will say this, and it goes to the same point,

21   that the 302s and the reports on the contents of these devices

22   that I received don't disclose several of the things that

23   Mr. Cervantes has now told us may be on these devices.  But

24   this is do the downloads, the cell phone and Cellebrite report,

25   and then the agent goes through the available data to identify,

1    at least highlight the issues that would be most important.  So

2    with respect to some of those things, the reports don't show

3    some of the things that are said there.

4         And I would also say that in the government's

5    presentation the issues which we believe really do raise a real

6    specter of a problem here in terms of someone else perhaps

7    having conducted this activity, the government's discovery does

8    point to some of these things.  And it's somewhat inconsistent

9    with -- not inconsistent.  Not that at all.  But there are

10   other aspects of these topics that the government touched on

11   that really should be brought to bear on the question of

12   whether it's possible, and it is in fact possible, that this is

13   not Mr. Encinas's activity.

14        So, for instance, in interviewing Mr. Encinas's

15   xxxxxxxxxxxx last April, she was shown a number of the images

16   that they had found at that point and were shared, for

17   instance, in the chat between X, Y, and the agent.  And the

18   xxxxxxxxxxxx told them at the time that those images were

19   principally recorded at a time when Mr. Encinas and his wife

20   were in Florida.  They were not in town.  They were not in the

21   apartment.

22        The camera, the Ring camera that -- the government

23   believes there are watermark stamps for the Ring camera.  The

24   Ring camera -- the smallest Ring camera that could have been

25   shooting those is the size of my phone, only about five times

1   as thick.  That's the size of a Ring camera.  They don't make a

2   secret pinhole camera or anything like that.  And if believed

3   that he left town --

4       THE COURT:  I get your point, Mr. Scheer.  They do

5   actually come a little bit smaller than that, but your point is

6   taken that --

7       MR. SCHEER:  Thank you, Your Honor.

8       THE COURT:  -- at this time they're still quite large.

9       MR. SCHEER:  Yes.  And they're out of town, and the

10  cameras are positioned in a place in that bathroom that they

11  would have been -- they'd be very hard to miss over a period of

12  three or four days, which is the length of time that they were

13  out of town.

14      The xxxxxxxxxxxx identified all four of the -- herself

15  and three friends who were at the apartment.  And we now know

16  that there were actually some number of teenage boys who were

17  also at the apartment that weekend.

18      In the chats, in the Session chats -- as the

19  government's information makes clear to us, in the Session

20  chats the person chatting is asked the girls' names, and one of

21  the girls' names is a girl named Rose.  Rose was at the

22  apartment that weekend.  No one in the Encinas family but the

23  xxxxxxxxxxxx knows Rose.  In fact --

24      THE COURT:  I don't know what people's ages are now, so

25  let's just be careful about using minor's names.  Let's use

1    their initials, if you can.

2           MR. SCHEER:  I don't have a last name, Your Honor.

3           THE COURT:  Let's refer to her as R, then.

4           MR. SCHEER:  Thank you.  I'll refrain from using it

5    again.

6           But that teenager was somebody who was a friend of one

7    of the other teenage girls that were at the apartment that

8    weekend.  And no one else in the Encinas family has ever heard

9    of her or met her, and that was something that Mr. Encinas's

10   xxxxxxxxxxxx told the FBI during her interview with them in

11   April of last year.  So whoever is in this chat knows a

12   woman -- a teenager who is at the house.  And some of the

13   images have this teenager, this third teenager identified in

14   them.  But whoever is doing the Session chat knows that

15   person's name, and none of the adults, Mr. Encinas nor his wife

16   nor anybody else know who she is or ever met her before, but

17   that name is shared by that person in a situation where there

18   are teenage boys also in the apartment.

19          And I just want to circle back.  I say this because

20   these cameras are not going to be easily or long-term

21   concealable from the people that are there.  When they did the

22   searches, there were no other cameras.  There was a Ring

23   doorbell camera, and there's a camera that everybody talked

24   about having been installed in the living room of the house.

25   But no other cameras of any kind were found and no apps for any

1    other type of camera.  There's a pinhole camera.  The Court

2    is probably well aware, if you've got a web cam or something

3    like that, you get at those things through the manufacturer's

4    app.  And no apps for any other cameras were found in any of

5    Mr. Encinas's devices.

6        Also, these descriptions -- and the government has

7    shared with the Court the descriptions of that person who was

8    in Session.  Their claims of their physical, direct physical

9    abuse on their -- on the 17-year-old, let's say even just

10   16-year-old, but not a young child, a 17-year-old teenager,

11   physically abusing that person and then getting them back to

12   sleep.  And the xxxxxxxxxxxx in this case interviewed

13   vehemently denies that there's ever been any such contact with

14   Mr. Encinas and goes on, frankly, to describe a relationship

15   which is utterly inapposite, completely opposite.  Having had a

16   situation where she was actually engaged knowingly -- I should

17   say he knowingly to her, having engaged in sexual abuse of her,

18   she absolutely denies it, but the person on the chat said that.

19       And then I would also say this about the government's

20   presentation.  Session is not an online chat application.

21   There is no browser-based access to Session.  One can't have a

22   URL saved on a computer to get to your Session account because

23   Session doesn't do it.  And it's wrapped directly in its

24   security protocols.  So there couldn't have been a URL that

25   takes somebody to your Session access and allows you to use

1    Session on your computer unless -- well, there couldn't be that

2    URL for that.  You have to log into Session on your device, if

3    you've got it.

4         And the government says that Session is a relatively

5    secret app and it's hard to get things.  The discovery that

6    we've got so far doesn't show them even trying.  Now, I'm sure

7    that they're working on that, and I'm sure that they're trying

8    to close that circle.

9         But to be very clear, Session -- and last week I signed

10   up for an account so I could learn a little bit more about the

11   app.  It's not something I'm intimately familiar with, though

12   I've researched it extensively now.  But having gotten the app,

13   you sign up for Session, and Session issues you an account

14   number.  And you exist in that application, and like any other

15   provider of that kind of service, I'd be shocked if Session

16   doesn't also keep the IP address information for the

17   subscriber.  We don't have any of that.  And I'll say again

18   that on none of these devices is the Session app present.

19        So without any kind of a warning that Mr. Encinas, if

20   he were the perpetrator of this, should clean up his act,

21   without any kind of a warning, they come in a couple three

22   months after the last time that this whoever X and Y was --

23   maybe it's three or four months -- and without any kind of a

24   warning to Mr. Encinas, somehow Session actually isn't

25   something that he's presently able to access.  He doesn't have

1     an access point to Session when they come in.  There's no other

2     cameras.  There's no camera applications.  There's no Session

3     application to be able to have used Session.

4            And having shown the xxxxxxxxxxxx everything that the

5     agent encountered with X and Y, none of it looked feasible to

6     her.  She didn't believe any of it.  And as I say, she told

7     them -- and I think they know -- that those images were shot

8     when both Mr. Encinas and his wife were 400 miles away.

9            So I bring this to the Court's attention just so that

10    as we do consider the strength of the government's case -- we

11    are all advocates in this courtroom, and when we make these

12    presentations, we are -- we wouldn't be any good at our jobs

13    if we weren't advocating.  In this case I would say to the

14    Court -- I would ask the Court to really ask the question

15    whether it's so strong, whether in fact there are knotholes,

16    whether in fact what we really do have is a case that may not

17    succeed in the long run.  And then what of the next four, five,

18    six, eight months before it does reach that point.

19            If I may just quickly look at my notes.

20            THE COURT:  Yeah.  And while you're looking at your

21    notes, I do have some questions for you.  So one of the tough

22    things in this case, as you know, is -- and you alluded to this

23    earlier -- okay, can we set conditions of release here.  Your

24    position is yes.  Mr. Cervantes's position is no.  I think

25    something the Court always struggles with here is, look, you

1  know, we could put software on, you know, a computer and

2  things, but I don't know the unknowns, right.  It's hard to

3  really protect against a camera hidden somewhere.  I don't know

4  how you set conditions for that.

5         What's the counterargument to that, Mr. Scheer?

6         MR. SCHEER:  Twenty-four-hour house arrest at his

7  grandparents' house under court order to help keep track of

8  things, along with those monitoring devices, so that he's not

9  in a place where he has any contact whatsoever with any minors

10  or anyone else that, if this were true, that he could

11  perpetrate an offense like it again, I think would be the

12  principal way.  If he is -- you know, I don't lightly offer up

13  24-hour house arrest, but for visits with his lawyer, which I

14  would, of course, ask under the circumstances --

15         THE COURT:  And the xxxxxxxxxxxx is not living at that

16  house; is that correct?

17         MR. SCHEER:  No.  And I should mention, Your Honor,

18  that the photographs of the room that later on the xxxxxxxxxxxx

19  spent some time living at at the grandparents' house, that's

20  dated 2020.  And as she told the FBI in that interview, she

21  hadn't lived in that bedroom yet.  She hadn't been there.

22         THE COURT:  Okay.

23         MR. SCHEER:  So it may have become her bedroom later,

24  but the xxxxxxxxxxxx has made it clear that it wasn't at the

25  time that the photograph was made, at least based on the

1    timestamp on the photo.  So, no, she doesn't live at that

2    place.  She lives with her mother right now.

3         And there's no question that the monitoring activity,

4    the presence of the grandparents, that there could be zero

5    contact between them and any other minor children.

6         I will say that it is one of these situations where, as

7    the Court can tell, the xxxxxxxxxxxx, having been shown a lot

8    of this evidence, not all of it, as Mr. Cervantes points out,

9    but having been shown a lot of the evidence, the xxxxxxxxxxxx

10   doesn't believe it's her xxxxxxxxxx, Mr. Encinas.  So in

11   prepping for the hearing, I thought how do I address the fact

12   that the Court may be concerned that the xxxxxxxxxxxx may take

13   steps to, for instance, blow through a court order and contact

14   him.  And I thought the best way to address that was to grab

15   the bull by the horns and just say this to the Court.  I think

16   that the people involved will be able -- the people involved

17   and the conditions, particularly monitoring and perhaps house

18   arrest, I think that can be voided.

19        I have met with the xxxxxxxxxxxx.  She asked to meet

20   with me, and I have met with her and spoke to her for a while

21   three weeks ago.  I actually will tell the Court my impression

22   is that she absolutely gets the gravity of this, does not

23   believe it, but is fully prepared to abide by whatever court

24   orders -- whatever orders the Court asks.

25        THE COURT:  Mr. Scheer, you and I have been doing this

1    a long time.  And, look, the Court's not making any judgment on

2    this, but that's a common victim response.

3              MR. SCHEER:  Absolutely.

4              THE COURT:  I think that's documented.  That's

5    objectively documented.  And so but your point is fair on that.

6    You've poked some holes, and that's what you're supposed to do.

7              MR. SCHEER:  Thank you, Your Honor.  I don't wish to be

8    heard anymore.  Thank you.

9              THE COURT:  Okay.  Thank you.

10             Mr. Cervantes, let's keep this one short, but come on

11   up.  Is there anything else you'd like to add to the record?

12             MR. CERVANTES:  Just real quick.  The xxxxxxxxxxxx has

13   not had an opportunity to hear all of the facts because she was

14   interviewed early on in relation to the search warrant, and the

15   forensics were ongoing and the analysis was ongoing.  And so

16   that part isn't true.  We would take issue with that.  That's

17   all.

18             THE COURT:  All right.  Very good.  All right.  Well,

19   the Court appreciates the good arguments of both the government

20   and the defense counsel.  Again, I just want to reiterate for

21   the defendant you are innocent until proven otherwise.  We are

22   not here today -- and I want the family to hear this as well.

23   We are not here today to weigh whether this is true or not

24   true.  That's not the Court's job today.  What the Court's job

25   is to look at the detention standards.

1    Now, as Mr. Cervantes noted, because of the nature of

2    these charges, there is a presumption of detention that

3    Congress has put in place.  However, as Mr. Scheer has pointed

4    out, that presumption is rebuttable.  In case law it's not that

5    difficult to rebut the presumption, but as Mr. Cervantes has

6    already noted, that just means he has the burden back.  And he

7    has to show that the defendant is a danger to the community or

8    that he's a flight risk.  On the flight risk issue, it's a

9    little bit of a closer call, but I think on the danger to the

10   community issue, I do have some great concerns there.

11   I think Mr. Scheer has done a very nice job for his

12   client, and I think he has pointed out all of the things I

13   would have pointed out if I were in his shoes as the defense

14   attorney.  But as he knows, these are some tough circumstances

15   to set conditions, and the reason is I could put software on a

16   computer, I could put him on home arrest, but I can't protect

17   against, you know, hard drives, and I can't protect against

18   cameras, I mean, unless we did a daily search of those things.

19   And these are so intrinsically woven into this matter that it

20   would be really hard to detect issues like that.

21   And the Court's got a real concern where the nature of

22   technology is these days, you can stream from kind of anywhere,

23   and you can use hard drives that can be easily hidden and

24   disconnected from a computer very easily.  And so it sounds

25   like there was a hard drive here.  That's also why I was asking

1     about some of the size of the cameras and things like that,

2     because I honestly want to look to see if there are conditions

3     that we can set.  But based on the record before me today, I

4     just can't find -- I'm very hard pressed to find how I could

5     set conditions of release in this case.

6            So, Mr. Scheer, I do appreciate -- I think you made all

7     of the arguments.  I don't think you missed one argument today.

8     You're always welcome to appeal my order to the district court

9     judge.  That will be Judge Cogburn.  So I will do an order

10    following this hearing, and that will have my full reasoning in

11    it, but you're always welcome to appeal my order if you so

12    choose.

13           Thank you all.  All right.  Thank you all.

14           MR. SCHEER:  Your Honor, I'll let the Court know, and

15    it doesn't matter very much.  I am going to be asking the

16    marshals to consider keeping him in Catawba for a couple, three

17    weeks so that we can make some progress on this massive

18    discovery before we have to start shuttling to Pikeville,

19    Kentucky.

20           THE COURT:  All right.  Mr. Scheer, I believe the

21    marshals can take that back.  Of course, the Court can't

22    control the detention facilities, but you're always welcome to

23    try to coordinate that with the marshals.

24           MR. SCHEER:  Thank you very much.

25           THE COURT:  Thank you.

1          (Proceedings concluded.)

2

3

                 UNITED STATES DISTRICT COURT
4
               WESTERN DISTRICT OF NORTH CAROLINA
5
                   CERTIFICATE OF REPORTER
6

7          I, Rebecca S. Maxcy, Federal Official Realtime Court

8     Reporter, in and for the United States District Court for the

9     Western District of North Carolina, do hereby certify that the

10    foregoing is a true and correct copy of the transcript

11    originally filed with the Clerk of Court on April 22, 2025, and

12    incorporating redactions of personal identifiers requested by

13    the following attorneys of record: Daniel Cervantes and Anthony

14    Scheer, in accordance with Judicial Conference policy.

15    Redacted characters appear as an "x" in the transcript.

16

17         Dated this 28th day of May, 2025.

18

19                   /s/ Rebecca S. Maxcy_____
                     REBECCA S. MAXCY, RMR, CRR
20                   Official Court Reporter

21

22

23

24

25